# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| Shane Moffat, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-12067-DJC |
| | ) | |
| U.S. Department of Justice, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                August 5, 2011

### I.     Introduction

Plaintiff Shane Moffat brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against the Department of Justice ("DOJ") and its components the Drug Enforcement Agency ("DEA"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the Federal Bureau of Investigation ("FBI").  Moffat claims that the defendant agencies failed to conduct adequate searches in response to his FOIA requests and, as to the FBI, inappropriately redacted responsive documents provided to Moffat.  The matter before the Court is the defendant agencies' motions for summary judgment.  For the reasons discussed below, the defendant agencies' motions for summary judgment are GRANTED.

### II.    Burden of Proof and Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party bears the burden of showing the district court the basis for its motion and identifying where there exists a lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Once the moving party has accomplished this feat, the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, to demonstrate that a trier of fact could reasonably resolve that issue in the her favor." Borges, 605 F.3d at 5 (citing Celotex, 477 U.S. at 324). "If the nonmovant fails to make this showing, then summary judgment is appropriate." Id. The Court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (citing Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994)). However, disputes over facts that are not material to the issues raised will not defeat a motion for summary judgment. Anderson, 477 U.S. at 248.

Summary judgment is available to a defendant in a FOIA case "when the agency proves that it has fully discharged its obligations under the FOIA after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." Crooker v. Tax Div. of U.S. Dep't of Justice, No. 94-30129-MAP, 1995 WL 783236, at *7 (D. Mass. Nov. 17, 1995) (internal quotations omitted) (citing Gordon v. Thornberg, 790 F. Supp. 374, 378 (D.R.I. 1992)). An agency fully discharges its burden when it "proves that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the FOIA's inspection requirements." Crooker, 1995 WL 783236, at *7 (internal quotations omitted) (quoting Gillen v. IRS, 980 F.2d 819, 821 (1st Cir. 1992)). Summary judgment in FOIA cases "may be granted solely on the basis of agency affidavits." Crooker, 1995 WL 783236, at *10 (citing Gardels

v. Central Intelligence Agency, 689 F.2d 1100, 1104-5 (D.C. Cir. 1982); Hemenway v. Hughes, 601 F. Supp. 1002, 1004 (D.D.C. 1985)).

## III.    Factual Background

Moffat, currently serving a life sentence for first-degree murder, sent FOIA requests to the DEA, ATF, and FBI in 2008 in hope of obtaining government records that allegedly would exonerate him.  See D. 24 (Moffat Affidavit) at ¶ 1.  The relevant correspondence between Moffat and the defendant agencies is as follows.  There is no material issue of fact as to this sequence of events.

### A.    Drug Enforcement Agency

By letter dated May 8, 2008, addressed to the DEA Freedom of Information Operations Unit ("DEA FOIA"),[1] Moffat's counsel, David Lewis, requested criminal investigative records pertaining to Moffat.  Item 14 of this request sought:  "[a]ll files and/or records maintained by the DEA that are indexed or maintained under the name or identifying information of Shane Moffat . . . aka 'Bone,' 'Bones' or 'Frank Motta.'"  Declaration of Katherine L. Myrick, Chief of the DEA Freedom of Information Operations Unit ("Myrick Decl."), ¶ 4 (internal quotations omitted).[2]

By letter dated July 22, 2008, the DEA informed Lewis that DEA FOIA had assigned case number 08-0895-F to his request and that Specialist Sondra Miller had been assigned to his case.

On November 7, 2008, the DEA informed Lewis that DEA FOIA could not proceed with his

---

[1]The DEA Freedom of Information Operations Unit is referred to within DEA as "SARO."  Myrick Decl., ¶ 1.  For ease of reference, the Court will refer to the unit as "DEA FOIA" rather than "SARO."

[2]Citations to the agency declarations in this case shall be to "_____Decl., ¶ __."

request for information regarding the multiple third-parties listed in his request, including Moffat, without third-party release authorization documents. This letter also contained DOJ Form 361, a standardized form used by DEA FOIA in its FOIA practice for the certification of requestor identity and the authorization of information releases to third-parties.

On February 13, 2009, Lewis again requested similar information from the DEA about Moffat specifically, "all files and records maintained by the DOJ and/or DEA that are indexed, maintained under, mention, refer to, or otherwise contains [sic] the name or identifying information of Shane Moffat . . . aka 'Bone,' 'Bones,' 'Naya Bonnsa,' or 'Frank Motta.'" Myrick Decl., ¶ 8 (internal quotations omitted). This request also sought any DOJ or DEA records containing FBI number 386380AA7. Additionally, Lewis' letter made requests concerning Moffat by referencing different enforcement contexts where Moffat's name may have arose. These requests included records regarding the alleged placement of the name "Shane Moffat . . . aka 'Bone,' 'Bones,' 'Naya Bonnsa,' or 'Frank Motta' on an unidentified criminal activity 'list' concerning Jamaican nationals; any memoranda of understanding or other correspondence about plaintiff [Moffat] transmitted between DEA and/or DOJ and other law enforcement agencies or Jamaican authorities; or references to plaintiff in the investigation and/or prosecution of a specific criminal case . . . : '*United States v. Wolfe*, et al., #3:99-cr-00266 (RNC).'" Id. Lewis attached a Privacy Waiver and Certification of Identity form used by the FBI; he did not provide a DOJ Form 361 as requested by the DEA in November 2008.

A March 17, 2009 letter from the DEA acknowledged receipt of Lewis' February 13, 2009 request and informed him that his request had been assigned FOIA Request number 09-0462-P. The DEA also stated that DEA FOIA was experiencing a large volume of incoming requests causing a

delay to Lewis' request.

While awaiting the receipt of DOJ Form 361 from Lewis, DEA FOIA conducted preliminary queries of the Investigative Reporting and Filing System ("IRFS")[3] to begin retrieving responsive files in the event any files existed. This name query also yielded no responsive records. "[T]here was no match or cross reference of any variation of the name 'Frank Motta' to [Moffat] by name, social security number, or date of birth" in the IRFS. Myrick Decl., ¶ 16.

By letter dated May 14, 2009, the DEA informed Lewis that DEA FOIA could not proceed with Moffat's request because Lewis had not provided a completed DOJ Form 361 with an original signature and release authorization. This letter attached another copy of the DOJ Form 361.[4]

On or about June 18, 2009, Lewis finally provided DEA FOIA with a completed DOJ Form 361 with an original signature and third-party release authorization from Moffat.[5]

By letter dated July 10, 2009, the DEA acknowledged receipt of Lewis' June 18, 2009 letter with the completed DOJ Form 361 from Moffat. This letter referred specifically only to the original 2008 request number, 08-0895-F. The DEA also informed Lewis that queries of the DEA IRFS were negative. Lewis was informed of his right to an administrative appeal of this result within sixty days. Lewis did not appeal.

---

[3]The IRFS is the DEA Privacy Act System of Records that contains all administrative, general and investigative files compiled by the DEA for law enforcement purposes. The DEA retrieves investigative reports and information from the IRFS via the DEA Narcotics and Dangerous Drugs Information System ("NADDIS") which indexes and identifies individuals by their name, Social Security number, and date of birth. Myrick Decl., ¶ 15.

[4]The FOIA specialist handling the request, however, wrote the incorrect administrative case number on the top of the DOJ Form 361, listing "09-0343-F" instead of the actual number assigned to Moffat's request, "09-0462-F."

[5]This letter also referenced the incorrect administrative case number, "09-0343-F."

On December 3, 2009, Moffat initiated this lawsuit against the DEA. In response, beginning on January 25, 2010, DEA FOIA conducted further queries related to Lewis' FOIA requests with assistance from the DEA's Office of Chief Counsel, Administrative Law Section ("CCA"). Additional NADDIS queries again yielded no responsive records within IRFS. DEA FOIA and CCA personnel also conducted queries of the FBI's National Crime Information Center ("NCIC") system. Queries of the NCIC system were two-part: first, a criminal history query in case Moffat had been arrested by DEA law enforcement; second, a query of the FBI number provided as part of Lewis' 2009 request, 386380AA7. Both queries were negative and neither provided any additional search leads on which to base further searches. In sum, all the DEA queries conducted through the present have yielded no responsive records.

## B.    Bureau of Alcohol, Tobacco, Firearms, and Explosives

Lewis sent a FOIA request to the ATF's Disclosure Division on November 20, 2008, requesting all ATF records concerning Shane Moffat. Upon receipt of Lewis' request, the Disclosure Division made several queries of both the TECS and N-Force databases.[6] These queries did not yield any responsive records. Declaration of Averill P. Graham, Chief of the ATF Disclosure Division ("Graham Decl.") ¶ 2.

By letter dated December 1, 2008, the Disclosure Division informed Lewis that a search of ATF records revealed no responsive records. The Disclosure Division suggested that Lewis provide

---

[6]TECS is a text-based computerized database, maintained by the Bureau of Customs and Border Protection, U.S. Department of Homeland Security, that is designed to identify individuals and businesses suspected of or involved in violation of federal law and is a "comprehensive ATF law enforcement database that contains ATF investigative records." Graham Decl., ¶ 9. N-Force is the ATF's official case file of record for documenting investigative activity and information, creating reports, tracking investigative leads, and linking data.

additional information that could assist in locating responsive records. The letter also informed Lewis about how to appeal the result of the ATF's search.

By letter dated January 20, 2009, Lewis filed an administrative appeal of the ATF's December 1, 2008 decision. By letter dated February 10, 2009, the Office of Information and Privacy ("OIP") informed Lewis that it had received his appeal. By letter dated May 27, 2009, OIP affirmed the ATF's action.

After Moffat filed his complaint in this case against the ATF on December 3, 2009, the ATF Office of Chief Counsel requested that the Disclosure Division search the TECS and N-Force databases again, utilizing all of Moffat's personally identifiable information. The Disclosure Division performed the searches, which again yielded no responsive records.

### C.    Federal Bureau of Investigation

Lewis submitted a FOIA request to FBI Headquarters in Washington, D.C. on November 12, 2008 requesting access to the following records:

> 1.  All files and records maintained by the DOJ and FBI that are indexed, maintained under, mention, refer to, or otherwise contain the names or identifying information of Shane Moffat (DOB XX-XX-1980) aka "Bone," "Bones," "Naya Bonnsa," or "Frank Motta."
>
> 2. All records prepared, collected, and/or maintained by the DOJ and/or FBI which mention, refer to, or otherwise contain FBI number 386380AA7.
>
> 3.  All records in FBI file 245-NH-38778 which mention, refer to, or otherwise contain the name of an individual known as "Shane Moffat," "Bone," "Bones," "Naya Bonnsa," or "Frank Motta."
>
> 4.  All records in FBI file 640545LB8 which mention, refer to, or otherwise contain the name of an individual known as "Shane Moffat," "Bone," "Bones," "Naya Bonnsa," or "Frank Motta."
>
> 5.  All records prepared, collected, and/or maintained by the DOJ and FBI in connection with the placement of the name Shane Moffat (DOB XX-XX-1980) aka

"Bone," "Bones," "Naya Bonnsa," or "Frank Motta" on any list of individuals known or suspected to be Jamaican nationals or of Jamaican heritage and known, suspected, believed, thought, or considered to be involved in criminal activity in the United States or elsewhere.

6. All records, including but not limited to, memoranda of understanding and correspondence, transmitted between, including material sent to or received from, the FBI and DOJ and any local or federal law enforcement agency or authorities in Jamaica regarding Shane Moffat (DOB XX-XX-1980) aka "Bone," "Bones," "Naya Bonnsa," or "Frank Motta."

7. All records prepared, collected, and maintained by the DOJ and FBI which mention, refer to, or otherwise contain the name of an individual known as Shane Moffat (DOB XX-XX-1980) aka "Bone," "Bones," "Naya Bonnsa," or "Frank Motta" in connection with the investigation and prosecution of Horace Richards (SSN XX-XX-9053, also appearing as XX-XX-3025) (DOB XX-XX-1959, also appearing as XX-XX-1964 and XX-XX-1964) aka "Desmond Wolfe" aka "Jimbo" in connection with, in preparation for, or in any way related to the investigation preceding "United States District Court, Connecticut case *United States v. Wolfe, et al.*, #3:99-cr-00266 (RNC).

8. FBI 302 report, dated 12-09-1999, from file #245I-NH-38778.

Declaration of David M. Hardy, Section Chief of FBI's Record/Information Dissemination Section ("RIDS"), located within the FBI's Records Management Division ("RMD") ("Hardy Decl.") ¶ 6.

By letter dated December 1, 2008, the FBI informed Lewis that it had assigned FOIA number 1123016-000 to his request, but that a search of the indices to the Central Records System ("CRS")[7] at FBI Headquarters did not yield any responsive main file records. The letter also notified Lewis of his right to appeal the FBI's query to the U.S. Department of Justice, Office of Information and Privacy ("OIP") within sixty days.

By letter dated January 20, 2009, Lewis appealed the action of the FBI. In a letter dated

_____

[7]The FBI utilizes the CRS to conduct searches in response to FOIA requests. The CRS consists of administrative, applicant, criminal, personnel, and other law enforcement records. The subject matter of a CRS file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter.

February 10, 2009, the OIP acknowledged receiving Lewis' appeal and informed him that the appeal had been assigned number 09-0964. In a letter dated April 14, 2009 to Lewis, the OIP affirmed the action of the FBI.

Additionally, in four different letters, each dated February 13, 2009, Lewis submitted separate FOIA requests to the Miami, Minneapolis, New Haven, and New York FBI Field Offices. These field office requests were identical to Lewis' FBI Headquarters request dated November 12, 2008. These field offices all acknowledged Lewis' request in March 2009.

By letter dated May 15, 2009, the FBI informed Lewis that a search of the indices to the CRS for the Miami, Minneapolis, New Haven, and New York Field Offices did not identify responsive records. This letter also notified Lewis of his right to appeal the FBI's decision within sixty days.

In a letter dated June 17, 2009, Lewis appealed the FBI's response to his Miami, Minneapolis, New Haven and New York Field Offices requests on the basis of the FBI's "refusal to disclose certain documents within its control." Hardy Decl., ¶ 17 (internal quotations omitted). The OIP acknowledged receipt of Lewis' appeal on June 29, 2009 and assigned it number 09-2114.

By letter dated September 4, 2009 to Lewis, the OIP affirmed the FBI's decision based on its search of the Miami, Minneapolis, New Haven and New York Field Offices.

The FBI did not receive any further correspondance from Lewis until he filed the complaint in this case on behalf of Moffat. After the complaint was filed,[8] the FBI conducted a more thorough

_____

[8]It is FBI policy to search for and identify only "main" files in response to a FOIA request until the requester actually sues the FBI, at which point a more thorough search is performed. Hardy Decl., ¶ 35. The more thorough search includes looking for "mention[s] of - or passing reference[s] to - the subject of the [FOIA] request in files relating to other individuals, organizations, events or activities." Id. at ¶ 35 n. 7. The FBI refers to such mentions as "cross-references." Id.

search of the CRS to locate records responsive to Lewis' request. Pursuant to this supplementary search, the FBI found six responsive records at FBI Headquarters and six additional responsive records within the New Haven Field Office file number 245I-NH-38778.

In a letter dated March 29, 2010, the FBI released sixteen pages of responsive records to Lewis, with some sections of the records redacted. This letter also advised Lewis of his right to appeal the FBI's search and redaction decisions to OIP and that he was required to appeal within sixty days.

In a letter dated May 27, 2010, Lewis appealed the FBI's March 29, 2010 release, based on the FBI's "refusal to disclose certain documents within its control." Hardy Decl., ¶ 22. By letter dated June 15, 2010, the OIP acknowledged receipt of Lewis' appeal on June 4, 2010 and assigned it number 2010-2170. By letter dated August 16, 2010, however, the OIP informed Lewis that it had received his appeal seven days after the regulatory deadline and therefore had closed the appeal.

In sum, the FBI has produced a total of sixteen pages of responsive records to Moffat. One page was produced in full and without redactions; fifteen pages were produced subject to redactions pursuant to FOIA Exemptions (b)(6), (b)(7)(A), (b)(7)©, and (b)(7)(D). The FBI has also withheld four pages of responsive records in full because the pages are duplicates of other pages that were produced to Moffat.

## IV. Procedural Background

Moffat filed the instant complaint on December 3, 2009. The DEA, ATF and FBI moved for summary judgment on June 15, 2010, June 29, 2010, and November 5, 2010, respectively.

Moffat filed oppositions, which included requests for further discovery under Fed. R. Civ. P. 56(f),[9] on October 7, 2010 and December 17, 2010. The case was transferred to this session on January 21, 2011. The Court held a hearing on all three motions on March 29, 2011.

**V.      Adequacy of Search Discussion**

      **A.      Legal Standards**

            **1.      Agency Search**

                  **a.      Adequacy of Search**

In the FOIA summary judgment context, a defendant agency subject to a FOIA request must establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oleskey v. U.S. Dep't of Defense, 658 F.Supp.2d 288, at 294 (D. Mass. 2009) (citing Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990)). "The crucial issue is not whether relevant documents might exist, but whether the agency's search was reasonably calculated to discover the requested documents." Maynard v. Cent. Intelligence Agency, 986 F.2d 547, 559 (1st Cir. 1993) (internal quotations omitted). Even if a plaintiff is correct that additional responsive records exist, an agency's failure to locate them "does not *ipso facto* render its search inadequate." Oleskey, 658 F.Supp.2d at 298. A "failure to turn up [a requested] document does not alone render the [agency's] search inadequate; there is no requirement that an agency produce *all* responsive documents." Nation Magazine, Washington Bureau v. U.S. Customs Serv., 71 F.3d 885, 892 n. 7 (D.C. Cir.

---

[9]Moffat's briefs rely on a version of Rule 56(f) that was superseded when the 2010 Amendments to Rule 56 went into effect on December 1, 2010. See Advisory Notes to Fed. R. Civ. P. 56. Rule 56(f) no longer discusses continuances to allow further discovery, but the substance of prior Rule 56(f) is now contained in Rule 56(d). Fed. R. Civ. P. 56(d).

1995).  The focus of the adequacy inquiry is thus not on the results, but rather on the search itself.

Oleskey, 658 F.Supp.2d at 298.

### b.      Demonstrating Adequacy

To demonstrate that an agency conducted an adequate search, the agency "may rely upon affidavits provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith."  Maynard, 986 F.2d at 559.  Sufficient affidavits may include "the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." Oglesby, 920 F.2d at 68.  Additional search details may include "the structure of the agency's file system, the scope of the search performed, and the method by which it was conducted."  Sephton v. Fed. Bureau of Investigation, 365 F.Supp.2d 91, 97 (D. Mass. 2005), aff'd, 442 F.3d 27 (1st Cir. 2006)).

### c.      Presumption of Good Faith

Once an agency has produced sufficient affidavits, a court must afford the government a presumption of good faith, and "the burden shifts to the requester to 'provide countervailing evidence as to the adequacy of the agency's search.'"  Oleskey, 658 F.Supp.2d at 295 (quoting Iturralde v. Copmtroller of Currency, 315 F.3d 311, 313-14 (D.C. Cir. 2003)).  If the requester introduces evidence that "raises substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials, summary judgment is inappropriate."  Iturralde, 315 F.3d at 314 (internal citations and quotations removed).

### B.      Defendants' Searches of Agency Records

### 1.      Drug Enforcement Agency

The issue regarding the DEA before the Court is the adequacy of its records search in response to Moffat's FOIA request. In this regard, the DEA relies on two government affidavits from DEA FOIA Chief Myrick. See generally Myrick Decl.; Second Myrick Decl. In her position, Myrick oversees the administrative requests to the DEA under both FOIA and the Privacy Act of 1974, 5 U.S.C. § 552(a). Myrick Decl., ¶ 1. DEA FOIA is the DEA office "responsible for responding to, the search for, and the processing and release of information requested under FOIA." Id.

Myrick's affidavits are "detailed and nonconclusory," see Maynard, 986 F.2d at 559, and they demonstrate, among other things, the search terms, types and methods of searches performed, and the structure of the DEA's file system, see Oleskey, 658 F.Supp.2d at 294-95. Myrick's affidavit states that Moffat's request was "broadly construed as a request for any and all investigative information that related to him in any form," and that "any information about Moffat was reasonably likely to be found in the IRFS and that no other record system was reasonably likely to contain responsive information." Myrick Decl., ¶ 13; see Oleskey, 658 F.Supp.2d at 294-95. Myrick also described the DEA IRFS, affirming that it contains all administrative, general and investigative files compiled by the DEA for law enforcement purposes and that IRFS files are titled according to the name of the principle suspect violator or entity known to the DEA at the time it opens the file. Myrick Decl., ¶ 13.

Further, the affidavit explains the type of search performed and the structure of the IRFS, explaining that the DEA retrieves investigative reports and information from the IRFS via the DEA NADDIS, which indexes individuals by their name, Social Security number, and date of birth. Id. at ¶ 15. NADDIS points to investigative files and particular DEA Reports of Investigation, DEA

Form-6 records, or other documents by date that contain information regarding a particular individual or subject of an investigation. Id. Myrick explains that a positive NADDIS query will point to a DEA-unique investigative file number but that the NADDIS cannot be queried by criminal case docket numbers or FBI numbers to locate DEA investigative files. Id. Additionally, the affidavit reveals the DEA's search terms, demonstrating that the DEA utilized Moffat's name and aliases, Social Security number and date of birth. Id. at ¶ 15-17.

Finally, Myrick's affidavit demonstrates that, after Moffat filed his complaint, the DEA expanded the scope of its search by conducting queries of the FBI's NCIC system and additional queries of NADDIS, utilizing Moffat's full name, Social Security Number, date of birth and aliases. Id. at ¶ 18. It is clear that courts are permitted to consider post-complaint search activities to determine the adequacy of a defendant agency's search. See Church of Scientology, Int'l v. U.S. Dep't of Justice, 30 F.3d 224, 227, 230 (1st Cir. 1994). In Church of Scientology, the plaintiff filed a FOIA request with the U.S. Attorney's Office in Boston and sued when it was dissatisfied with the agency's response. Id. at 227. During the ensuing litigation, the U.S. Attorney's Office determined that due to poor record-keeping it was unable to ascertain how it conducted its pre-complaint search; instead, after the complaint was filed, the agency conducted and documented an entirely new search. Id. This post-complaint search led to the release of additional records. Id. Both the District Court and Court of Appeals relied upon these post-complaint search activities to hold that the U.S. Attorney's Office's search was adequate. See id. at 230. Moreover, here, the post-complaint queries conducted by DEA yielded no responsive records and did not provide any additional search leads on which to base further searches. Myrick Decl., ¶ 18. An NCIC query by the DEA of the FBI number provided as part of Lewis' 2009 request, 386380AA7, was also negative, and Myrick states

that this number relates solely to a third party.  Id.  These affidavits demonstrate that the DEA's search "was reasonably calculated to discover the requested documents."  Maynard, 986 F.2d at 559.

In sum, Myrick's affidavits provide in a "detailed and nonconclusory manner," see id., descriptions of the DEA's search terms, the types of searches performed, the scope of the search, the method by which the searches were performed and the structure of the DEA's file system. See Oleskey, 658 F.Supp.2d at 294-95 (citing Iturralde, 315 F.3d at 313-14).  The DEA has met its burden of demonstrating good faith as to the adequacy of its search. See id. at 295.

### 2.    Bureau of Alcohol, Tobacco, Firearms, and Explosives

The issue regarding the ATF before the Court is the adequacy of its record search in response to Moffat's FOIA request.  In this regard, the ATF relies on two government affidavits from Disclosure Division Chief Graham.  See generally Graham Decl.; Second Graham Decl.  In his position, Graham receives all ATF FOIA requests and reviews all requests referred to ATF from other agencies that have located ATF-originated documents in their records while processing their FOIA requests.  Graham Decl., ¶ 1.  Graham processes all FOIA requests, initiates searches relevant to such requests, supervises the determination of what records should be disclosed, processes all documents referred to the ATF and to other agencies and records all administrative appeals filed with the ATF.  Id.

Graham's affidavits are "detailed and nonclusory," Maynard, 986 F.2d at 559, and provide a thorough explanation of the ATF's search for records responsive to Moffat's request, describing the structure of the ATF's file systems, the methods and types of searches performed, the scope of the search and the search terms.  First, Graham affirms that all indices and file systems that would contain information concerning Moffat were reasonably searched.  Graham Decl., ¶ 8.

Graham's affidavit describes the TECS, which "identif[ies] individuals and businesses suspected of or involved in violation of federal law," as well as permits message transmittal between federal law enforcement agencies and other international, state, and local law enforcement agencies. <u>Id.</u> at ¶ 9.  Graham further affirms that the TECS database contains the names of individuals the ATF has investigated and "was the place most likely to locate responsive records." <u>Id.</u>  The Disclosure division queried the TECS' seven record subsections – People, Businesses, Aircraft, Firearms, Vehicles, Vessels and Things – for responsive records, utilizing  Moffat's first and last names and date of birth as search terms. <u>Id.</u> at ¶ 10.  These queries yielded no responsive records. <u>Id.</u>

Graham's affidavit also explains in detail the structure and purposes of the N-Force case management system. <u>Id.</u> at ¶ 11.  The affidavit explains that N-Force is a "case management system designed to support ATF law enforcement operations" and is the ATF's official case file of record for documenting investigative activity and information, creating reports, tracking investigative leads, and linking data. <u>Id.</u>  N-Force also contains several subsections including, among other subsections, Firearms, Arson/Explosives, and Investigative Profile, which are divided into sub-data fields that may contain information about an investigation and persons involved. <u>Id.</u>  The ATF made several queries of N-Force on November 26, 2008, utilizing Moffat's date of birth, name, and some of his aliases. <u>Id.</u> at ¶ 12; Second Graham Decl., ¶ 5.  After Moffat filed the complaint in this case on December 3, 2009, the ATF again queried N-Force on or around January 22, 2010, utilizing, among other things, Moffat's date of birth, name and all of his aliases.  Graham Decl., ¶ 13.  None of these additional queries yielded responsive records. <u>Id.</u>  These affidavits demonstrate that the DEA's search "was reasonably calculated to discover responsive documents." <u>Maynard</u>, 986 F.2d at 565.

In sum, Graham's affidavits provide in a "detailed and nonconclusory manner," <u>Maynard</u>,

986 F.2d at 559, descriptions of the ATF's search terms, the types of searches performed, the scope of the searches, the method by which the searches were performed, and the structure of the ATF's file systems, see Iturralde, 315 F.3d at 313-14.  Consequently, the DEA has met its burden of demonstrating good faith as to the adequacy of its search.  Oleskey, 658 F.Supp.2d at 295.

### 3.    Federal Bureau of Investigation

Moffat's challenge to the FBI stands on different footing than his challenge to the other two agencies since there are two issues regarding the FBI's response to his FOIA requests–namely, the adequacy of the Bureau's search and whether the FOIA exemptions it claims should apply. Concerning the adequacy of the FBI's search, the FBI relies on two government affidavits from RIDS Section Chief Hardy.  See generally Hardy Decl., Second Hardy Decl.  In his capacity as Section Chief, Hardy supervises approximately two-hundred eighty employees who staff ten FBI Headquarters units and two field operational service center units "whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA."  Hardy Decl., ¶ 2.

Hardy's affidavits explain in a detailed and nonconclusory manner the FBI's search for records responsive to Moffat's FOIA request, documenting, among other things, the structure of the FBI's file systems, the search terms used and the method by which the FBI conducted the searches. Hardy states that the FBI utilizes the CRS to conduct searches that are likely to yield documents responsive to FOIA requests and that the CRS consists of administrative, applicant, criminal, personnel and other law enforcement records.  Hardy Decl., ¶ 25.  The subject matter of any CRS file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter.  Id.

The affidavit also provides a detailed explanation of how the FBI queries the CRS via the General Indices, which consist of index cards on various subject matters that may be searched manually or through automated indices. Id. The General Indices of the CRS are divided into two categories: (a) a "main" entry, which carries the name corresponding with a subject of a file contained in the CRS; and (b) a "reference" entry or "cross-reference," which is generally only a mention or reference to an individual, organization, or other subject matter contained in a document located in another "main" file in a different subject matter. Id. at ¶ 27. The FBI queries its field offices in the same manner. Id. Hardy also explains the implementation of the ACS system, which consolidated portions of the CRS and now allows for electronic searches of FBI records. Id. at 28.

Using these records systems, Hardy explains that the FBI and its field offices searched its records on several occasions from November 2008 to March 2009, utilizing the following search terms: Moffat's first and last names, aliases, and the file and FBI numbers provided by Lewis, namely, FBI number 386380AA7 and file number 2451-NH-38778. Id. at ¶¶ 31-34. None of these queries yielded any responsive records, and FBI number 38680AA7 belonged to a third-party for whom a privacy waiver was not supplied. Id. Finally, after Moffat filed his complaint, Hardy states that the FBI conducted an additional search of the CRS for any cross-references responsive to Lewis' request. Id. at ¶ 35. These queries produced twenty pages of which the FBI released one full page and fifteen pages in part. Id. at ¶ 40. A search of the alleged FBI file number 640545LB8 yielded no responsive results, and Hardy explains that it is not an FBI file number. Id. at ¶ 37.

In sum, Hardy's affidavits provide in a "detailed and nonconclusory manner," id. at 559, descriptions of the FBI's search terms, the types of searches performed, the scope of the searches, the method by which the searches were performed and the structure of the FBI's file systems. They

demonstrate that the DEA's search "was reasonably calculated to discover responsive documents." Maynard, 986 F.2d at 565. The FBI has met its initial burden of demonstrating good faith as to the adequacy of its search. Oleskey, 658 F.Supp.2d at 295.

### C. Moffat's Objections

Because the DEA, ATF and FBI have demonstrated good faith as to the adequacy of their searches, Moffat had the burden of "provid[ing] countervailing evidence as to the adequacy of the agency's searches." Iturralde, 315 F.3d at 314. As discussed below, Moffat has failed to raise substantial doubt as to the defendants' searches and summary judgment for the defendants is therefore appropriate. Moffat's objections amount to mere "speculation about the existence and discoverability of other documents." Maynard, 986 F.2d at 559.

### 1. DEA

The Court has discerned four arguments concerning Moffat's allegations of bad faith regarding the DEA's search efforts upon which Moffat bases his opposition to DEA's motion for summary judgement.[10] None of these arguments are compelling. First, Moffat attempts to create a material issue of fact by stating that the DEA never informed him that case numbers 09-0462-F and 08-0895-F had been administratively merged. The DEA's affidavit affirms that this "merger . . . was an action of administrative efficiency that had no substantive impact on the search methodology employed by DEA to locate any and all investigative information about Shane O. Moffat." Second Myrick Decl., ¶ 3. Moffat does not bring forth any evidence to demonstrate how the DEA's failure to inform him of this administrative merger impacted the DEA's search efforts.

---

[10]Moffat's briefing in this case "is not a model of clarity." See Muñoz-Monsalve v. Mukasey, 551 F.3d 1, 5-6 (1st Cir. 2008). The Court will address the basic claims of agency error Moffat appears to be making in his filings with the Court and at oral argument.

Second, Moffat attempts to create an issue by raising a reference to the term "Correspondence Files," which was used in a DEA letter sent to Lewis in response to a 2008 FOIA request that is unrelated to this case, using this reference to suggest that other DEA filing systems could have been queried. This argument lacks merit, however, because the DEA has clarified that there is no "Correspondence Files" records system and that the term was a general reference used in response to an unrelated 2008 FOIA request from Lewis. Id. at ¶ 5. Myrick explains that the use of this term "has . . . been removed from [DEA] response letters to requesters to avoid confusion regrading [sic] records systems." Id.

Third, Moffat questions the DEA's good faith effort to locate responsive records by pointing out that since the FBI produced records and the DEA queried the FBI's NCIC database, the DEA's search was inadequate because it claimed to find no responsive documents. This argument also lacks merit because, as affirmed by Myrick, the DEA "did not perform a search for documents that belong to FBI or other agencies," but rather the DEA queried the NCIC system for references to *DEA* actions with respect to Moffat that "could provide further information on which to base a search for DEA records." Id. at ¶ 7. As the government's counsel made clear at oral argument, although the DEA has access to the FBI NCIC system, the DEA only looks for DEA records within NCIC and does not have access to FBI records within the system.

Finally, Moffat's references to and request for records concerning the individual "Desmond Wolfe" are irrelevant. The instant search concerns records pertaining to Moffat. The DEA never received certification of identity and third-party release authorization from either Moffat or Lewis to query for records regarding Wolfe. Id. at ¶ 4.

In sum, Moffat has not met his burden of providing countervailing evidence as to the

adequacy of the DEA's searches.  <u>Oleskey</u>, 658 F.Supp.2d at 294-95.

## 2.    ATF

The Court has discerned three arguments concerning Moffat's allegations of bad faith regarding the ATF's search efforts upon which Moffat bases his opposition to ATF's motion for summary judgment.  First, Moffat attempts to create an issue of material fact by arguing that ATF did not explain why it did not search all of Moffat's aliases in the TECS in November 2008 upon receipt of Moffat's request for responsive records.  Whether the TECS or N-Force databases were searched in November 2008 for all personally identifiable information, including Moffat's aliases, is immaterial; the ATF searched these databases again in January 2010, using all of Moffat's aliases and personally identifiable information to guide the search.  Second Graham Decl., ¶ 7; <u>see</u> <u>Church of Scientology</u>, 30 F.3d at 227, 230.

Second, Moffat attempts to create an issue by contending that the ATF failed to explain what search, if any, was conducted regarding the information provided by Lewis' November 20, 2008 request in addition to Moffat's personally identifiable information.  Moffat does not specify which additional information he is referring to, but both this Court and the ATF presume that Moffat is referring to the purported FBI case and file numbers in the November 2008 request, namely, 386380AA7, 245I-NH-38778 and 640545LB8.  This argument is unavailing, however, because although the ATF can search the FBI's NCIC and NLETS systems, these searches are limited to ATF case information within the NCIC and NLETS systems, and the ATF does not have access to FBI records or information.  Second Graham Decl., ¶ 12.

Finally, Moffat attaches an ATF Firearms Trace Summary dated June 5, 1999, to his opposition to the ATF's motion to dismiss, D. 13 at 9-10, alleges that the Trace Summary must be

part of an ATF case file containing records concerning Moffat, and accuses the ATF of bad faith for failing to search the case file. Moffat's argument is speculative at best. First, the Trace Summary presented by Moffat lacks any personally identifiable information concerning Moffat, see D. 13 at 9-10, and it is not clear to the Court that even an exhaustive search of ATF records for documents relating to Moffat would turn up such a record. Second, even if the Trace Summary did include identifying information linking the record to Moffat, the Court fails to see why such information would necessarily suggest the existence of a case file dedicated to Moffat. Taken together, the Trace Summary provided by Moffat to the Court in no way undermines the ATF's assertion that it conducted its searches in good faith. Maynard, 986 F.2d at 560.

In sum, Moffat has not met his burden of "provid[ing] countervailing evidence as to the adequacy of the ATF's searches." Iturralde, 315 F.3d at 314.

### 3.    FBI

The Court has discerned two arguments concerning Moffat's allegations of bad faith regarding the FBI's search efforts. First, Moffat alleges bad faith because the FBI denies receiving a July 2007 FOIA request from Lewis seeking access to records referencing FBI number 386380AA7. Moffat has provided an FBI response letter to that request, dated October 17, 2007, that seems to indicate that the FBI did in fact receive such a request. D. 21 at 17. This dispute, however, is not relevant; Moffat's complaint challenges the FBI's handling of his November 12, 2008 request (which also sought access to records referencing FBI number 386380AA7), not any prior requests. Whether the FBI did in fact receive Lewis' July 2007 request has no bearing on the adequacy of the FBI's search for records pursuant to Moffat's November 12, 2008 request.

Second, Moffat alleges bad faith because he believes that any good faith search by the FBI

would have uncovered records responsive to Moffat's request for "[a]ll records in FBI file 640545LB8 which mention, refer to, or otherwise contain the name of" Moffat. Hardy Decl., ¶ 6. In support of his argument, Moffat attaches a document allegedly from the Massachusetts Department of Corrections that includes the text "FBI: 640545LB8" in a column titled "Identifiers." D. 21 at 18. But the FBI asserts that this number "is not an FBI file number," Hardy Decl., ¶ 37, and the document submitted by Moffat does not contradict that assertion; the document that shows the number does not indicate in any way that the number is the title or index of a discrete file as opposed to some other sort of identifier. Further, Moffat's argument incorrectly focuses the adequacy inquiry on the FBI's search results and not on the actual search itself. The "crucial issue is not whether relevant documents might exist, but whether the agency's search was reasonably calculated to discover the requested documents." Maynard, 986 F.2d at 559. Even if a plaintiff is correct that additional responsive records exist, an agency's failure to locate them "does not *ipso facto* render its search inadequate." Oleskey, 658 F.Supp.2d at 298.

In sum, Moffat has not shown bad faith on the part of the Defendants during the course of their searches on Moffat's behalf. Nor has he otherwise shown that discovery is needed to resolve any genuine issues of material fact related to the searches. See Asarco, Inc. v. U.S. Envtl. Prot. Agency, No. 08-1332-EGS/JMF, 2009 WL 1138830, at *1-*3 (D.D.C. Apr. 28, 2009) (denying discovery request brought under prior Fed. R. Civ. P. 56(f) in a FOIA case where plaintiff "fail[ed] to show how the discovery it seeks is necessary for the resolution of a genuine issue of material fact as to the adequacy of the agency's search").

## VI.     Exemptions Discussion

### A.     Legal Standards and the FBI's Exemption Claims

### 1.    Exemptions 6, 7(A), 7©, and 7(D)

#### a.    Exemptions Generally

The FOIA requires government agencies to "'make . . . promptly available' to any person, upon request, whatever records the agency possesses unless those records fall within any of twelve listed exceptions."[11] Crooker, 1995 WL 783236, at *1 (internal quotations omitted) (quoting 5 U.S.C. § 552(a)(3), (b)).    Because "[t]he policy underlying FOIA is broad disclosure, the government bear[s] the burden of demonstrating the applicability of a claimed exception."  Id.

Courts construe FOIA exemptions narrowly, Curran v. U.S. Dep't of Justice, 813 F.2d 473, 473-74 (1st Cir. 1987), and any "[d]oubts are customarily to be resolved in favor of openness," Irons v. Fed. Bureau of Investigation, 811 F.2d 681, 685 (1st Cir. 1987) (citing FBI v. Abramson, 456 U.S.

---

[11]The relevant FOIA exemptions in this case are Exemptions 6 and 7.  The FOIA disclosure requirement does not apply to matters that are:

> **(6)** personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

> **(7)** records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, © could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual.

5 U.S.C. § 552(b)(6)-(7).

615, 630-31 (1982)).  When a plaintiff challenges the government's claimed exemptions, a district

court "must determine *de novo* whether the agency has met its burden."  <u>Crooker</u>, 1995 WL 783236,

at *1.  When an agency withholds a responsive record pursuant to an exemption, the agency must

provide a description of the withheld record and a detailed explanation of why such an exemption

applies.  <u>See</u> <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973).  Such an explanation, usually in the

form of a government affidavit, is commonly referred to as a "<u>Vaughn</u> index."  <u>See</u> <u>Carpenter v. U.S.

Dep't of Justice</u>, 470 F.3d 434, 442, 442 n. 13 (1st Cir. 2006).

### b.       Exemption 7 Threshold

As explained above, the FOIA does not require disclosure of records or information that fall

within listed exemptions.  Exemption 7, 5 U.S.C. § 522(b)(7), protects "records or information

compiled for law enforcement purposes, but only to the extent that the production of such law

enforcement records or information . . . could reasonably be expected to" cause one of the harms

enumerated under the subsections of Exemption 7, 5 U.S.C. § 522(b)(7)(A-F).  Thus, an agency that

relies on Exemption 7 to withhold responsive records from a FOIA requester must make a threshold

showing that the records at issue relate to the enforcement of federal laws and that the enforcement

activity involves one of the law enforcement duties of that agency.  The Exemption 7 threshold test

is "whether the requested documents relate to anything that can fairly be characterized as an

enforcement proceeding."  <u>General Elec. Co. v. U.S. Envtl. Prot. Agency</u>, 18 F.Supp.2d 138, 143

(D. Mass. 1998) (internal quotations omitted).  Courts have also interpreted Exemption 7 to apply

to enforcement proceedings that are "pending or reasonably anticipated."  <u>General Elec.</u>, 18

F.Supp.2d at 143 (internal quotations omitted).  If an agency meets this burden, it must then

demonstrate that disclosure of the records at issue could reasonably be expected to cause any of the

enumerated harms.  See 5 U.S.C. § 552(b)(7);  Church of Scientology of Bos. v. Internal Revenue Service, 138 F.R.D. 9, 11 (D. Mass. 1990).


## I.       FBI Meets the Exemption 7 Threshold

The FBI has met the Exemption 7 threshold burden by demonstrating through Hardy's affidavits that the redacted documents "relate to [something] that can be fairly characterized as an enforcement proceeding," see General Elec., 18 F. Supp. 2d at 143, and that the enforcement activity involves one of the law enforcement duties of the FBI.

Hardy's affidavit asserts that the cross-references processed in this case cover the following kinds of subject matter:

> 1.  Incidents involving Moffat while he was in jail awaiting trial on a state murder charge.
>
> 2.  Information concerning a Connecticut Violent Crimes Fugitive Task Force investigation of an unlawful flight to avoid prosecution.
>
> 3.  Information concerning an ongoing criminal investigation related to illegal firearms and racketeering.
>
> 4.  Files concerning narcotics distribution, murder, drug conspiracy, and narcotics distribution.
>
> 5. A file concerning electronic surveillance.

Hardy Decl., ¶ 44.

Hardy asserts that this Vaughn index "fall[s] squarely within the law enforcement duties of the FBI, and the information readily meets the threshold requirement of Exemption 7." Hardy Decl., ¶ 44.  The Court finds, based on Hardy's descriptions, that these records were compiled for law enforcement purposes.  Because the FBI has met the Exemption 7 threshold, the remaining inquiry

is whether the disclosure of these documents could reasonably be expected to cause the harms enumerated under Exemptions 7(A), 7(C) and 7(D).

### c.      Exemption 7(A):   Interference with Law Enforcement

Exemption 7(A) applies to records or information compiled for law enforcement purposes, the disclosure of which "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  Under Exemption 7(A), there is no room for judicial balancing; "[s]o long as one is dealing with 'investigatory records compiled for law enforcement purposes,' 5 U.S.C. § 552(b)(7), the inherent nature of the requested documents is irrelevant to the question of exemption." Irons, 811 F.2d at 685.  Consequently, the applicability of Exemption 7(A) turns entirely on whether or not the information "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).   If so, disclosure is precluded.   "The key question becomes whether revelation of the data will tend to obstruct, impede, or hinder enforcement proceedings." Curran, 813 F.2d at 474.

### I.      FBI's Exemption Claim Pursuant to 7(A)

Hardy's affidavit demonstrates that full disclosure of the redacted documents could, as laid out in Exemption 7(A), "reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  The only document that the FBI redacted pursuant to Exemption 7(A), File 281D-NY-289921-302, consists of a witness interview form which may later  be used as "part of a Federal Grand Jury proceeding or at criminal trials."  Hardy Decl., ¶ 47.  Hardy further explains that such interview forms are often incorporated into FBI Investigative Reports that may also then be "incorporated into electronic communications (ECs) for the purpose of following up on a lead."  Id.

Finally, the affidavit asserts that the New York FBI Field Office has "advised RIDS that releasing the identifying information in this serial would likely endanger an ongoing investigation as certain individuals have yet to be sentenced." Id. Because the release of this document could compromise an open investigation, this Court finds that the FBI properly withheld it pursuant to Exemption 7(A). See Irons, 811 F.2d at 685.

### d. Exemption 7(C): Unwarranted Invasion of Personal Privacy

Exemption 7(C) applies to records or information compiled for law enforcement purposes, the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . ." 5 U.S.C. § 552(7)(b)(C). "Whether disclosure of a . . . document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the [FOIA] to open agency action to the light of public scrutiny rather than on the particular purpose for which the document is being requested." See Pugh v. Fed. Bureau of Investigation, No. 10-1016-RLW, 2011 WL 247026, at *4 (June 23, 2011 D.D.C.) (internal quotations omitted) (citing U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 498 U.S. 749, 772 (1989)).[12]

---

[12]The FBI also claims an exemption pursuant to 5 U.S.C. § 552(b)(6), which applies to all "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy . . . ." Unlike Exemption 7(C), which applies only to records or information compiled for law enforcement purposes, Exemption 6 applies to all records or information and also requires an agency to balance the relevant privacy and public interests, although the threshold is higher than that which Exemption 7(C) requires. Crooker, 1995 WL 783236, at *16 (noting that the Exemption 6 balancing test enunciated by the Supreme Court in Dep't of Air Force v. Rose, 425 U.S. 352 (1976), also applies to Exemption 7(C)). Because the FBI has met the Exemption 7 threshold burden of proving that all the records responsive to Moffat's request were compiled for law enforcement purposes, and because all of the records the FBI redacted pursuant to Exemption 7(C) were also redacted pursuant to Exemption 6, this Court has decided not to address the FBI's Exemption 6 claim. See Pugh, 2011 WL 2474026, at *2 n. 4 (concluding that all records responsive to the plaintiff's request,

28

Consequently, when applying Exemption 7(C) under FOIA, a court "must balance the private and public interests involved." Crooker, 1995 WL 783236, at *16 (citing Reporters Committee, 489 U.S. at 762). There is "no mechanical rule of disclosure or non-disclosure. Nor . . . [is there] a formula for measuring the impact of the privacy invasion resulting from disclosure. These . . . [competing private and public] variables must be determined and weighed in light of the particular circumstances in each case." Providence Journal Co. v. U.S. Dep't of Army, 981 F.2d 552, 569 (1st Cir. 1992). Under this test, if there is "an important public interest in the disclosure of information and the invasion of privacy is not substantial, the private interest in protecting the disclosure must yield to the superior public interest." Crooker, 1995 WL 783236, at *16 (quoting Alirez v. Nat'l Labor Relations Bd., 676 F.2d 423, 426-27 (10th Cir. 1982)).

Conversely, the information is exempt from disclosure "if the invasion of privacy is serious and there is little or no public interest involved." Id. (quoting Alirez, 676 F.2d at 426-27). Further, courts have consistently held that "where the plaintiff has failed to demonstrate any superior public interest that would be served by disclosure, the competing interest of avoiding an unwarranted invasion of personal privacy takes precedence, and the information is exempt from disclosure under Exemption 7(C)." Id. at *17. Several courts have "implicitly recognized a public interest favoring the non-disclosure of personal privacy information," id. (collecting cases), as Exemption 7(C) "takes particular note of the strong interest of individuals, whether they be suspects, witnesses, or investigators, in not being associated unwarrantedly with alleged criminal activity." Id. at *18 (quoting Dunkelberger v. Dep't of Justice, 906 F.2d 779. 781 (D.C. Cir. 1990)).

---

assuming they exist, would have been "compiled for law enforcement purposes," and addressing only the FBI's claims pursuant to Exemption 7(C)).

Finally, Exemption 7(C) is applicable even if a source's confidentiality has already been exposed, since "[a]n individual does not lose his privacy interest under 7(C) because his identity . . . may be discovered through other means."  Crooker, 1995 WL 783236, at *18 (quoting L&C Marine Transp. Ltd v. United States, 740 F.2d 919, 922 (11th Cir. 1984)).

## I.  FBI's Exemption Claim Pursuant to 7(C)

Upon a review of the private and public interests involved in Moffat's FOIA request, this Court finds that the FBI properly found that the privacy interests of the individuals mentioned in the FBI records outweighed the public interest in disclosure.  See Crooker, 1995 WL 783236, at *16.  Thus, the FBI appropriately withheld records pursuant to Exemption 7(C), finding that disclosure of certain records "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. 522(b)(7)(C).

Here, in each instance where information was withheld, the Court agrees that the individual privacy interests outweighed the public interest, as disclosure of the documents "would not shed any light on the operations and activities of the federal government."  See Reporters Committee, 489 U.S. at 772 (quoting EPA v. Mink, 410 U.S. 73, 80 (1973) (Douglas, J., dissenting)).  The records withheld by the FBI contain the names, addresses, dates of birth and other personal information of individuals whom the FBI interviewed during the course of criminal investigations.  Hardy Decl., ¶ 50.  The FBI asserts, and Moffat does not dispute, that disclosure could subject these individuals to harassment, intimidation, threats, or even economic and physical harm, which could deter this kind of assistance to the FBI in the future.  Id. at ¶ 51.

Interest in the safety of these individuals and the FBI's ability to effectively carry out its operations outweighs any interest that the public might derive from knowing the names of those

whom the FBI interviewed. Further, Moffat has failed to demonstrate any other superior public interest. See Crooker, 1995 WL 78326, at *16; Pugh, 2011 WL 2474026, at *4 (quoting Burke v. U.S. Dep't of Justice, No. 96-1739, 1999 WL 1032814, *4 (D.D.C. Sept. 30, 1999)).

The FBI also withheld agency records to protect the names and identifying information of FBI Special Agents, employees of the DEA Task Force and U.S. Immigration and Naturalization Service, and employees of the Hartford Police Department, Connecticut Violent Crimes Fugitive Task Force, Connecticut State Police, and the Hampden County Sheriff's Department. Hardy Decl., ¶¶ 53-57. The FBI asserts, and Moffat does not dispute, that the disclosure of identifying information concerning these individuals could also prejudice their effectiveness in conducting criminal investigations and may also subject them to various forms of hostility for their roles in criminal investigations. Id.

The Court has not identified and Moffat has not demonstrated a superior public interest that "would . . . shed any light on the operations and activities of the federal government," which is the basic purpose of FOIA. Reporters Committee, 489 U.S. at 772 (quoting Rose, 425 U.S. at 372).

Finally, the FBI properly withheld records containing the identifying information of third parties mentioned in documents concerning the criminal investigations released in the cross-references and of third parties who are of investigative interest to the FBI and other law enforcement agencies. Hardy Decl., ¶¶ 54, 58. Many of the reasons already stated also apply to the records concerning the identifying information of these third parties. In particular, if the FBI disclosed the names of these third parties, they would possibly be subject to harassment or criticism as connections to investigations of criminal activities carry an "extremely negative connotation." Id. at ¶ 54. Consequently, these individuals' rights to privacy and safety outweigh any public interest

given Moffat's failure to demonstrate how the revelation of this kind of information would shed light on the operations and activities of the FBI or federal government.

### e. Exemption 7(D): Disclosure of Confidential Sources

Exemption 7(D) applies to records or information compiled for law enforcement purposes, the disclosure of which "could reasonably be expected to disclose the identity of a confidential sources, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source." 5 U.S.C. 552(b)(7)(D). Like Exemption 7(A), 7(D) leaves no room for judicial balancing and is to be read literally. The Globe Newspaper Co. v. Fed. Bureau of Investigation, Civ. A. No. 91-13257-Z, 1992 WL 396327, at *5 (D. Mass. Dec. 29, 1992) (quoting Irons, 880 F.2d at 1449). In sum, if disclosure of agency records could reasonably lead to the revelation of the identity of a confidential source and information supplied by the confidential source, then they will be exempt from disclosure. See Crooker, 1995 WL 783236, at *21.

### I. FBI's Exemption Claim Pursuant to 7(D)

Hardy's affidavits demonstrate that the FBI properly redacted the responsive records pursuant to Exemption 7(D). Exemption 7(D) is to be read literally, The Globe Newspaper Co., 1992 WL 396327, at *5, and these redacted records "could reasonably be expected to disclose the identity of a confidential source . . . which furnished information on a confidential basis . . . ." Hardy explains that some sources provide information under an express assurance of confidentiality,

while other individuals are interviewed under circumstances from which an assurance of confidentiality can be reasonably inferred. Hardy Decl., ¶ 60. He further explains that "these individuals are considered to be confidential sources since they furnished information only with the understanding that their identities and the information provided will not be released outside the FBI." Id.

The FBI properly withheld records to protect those sources who provided information under an "implied" assurance of confidentiality. Hardy explains that these individuals were interviewed "under circumstances from which an assurance of confidentiality may be implied" because they were reporting on subjects concerning murder and illegal drug trafficking. Id. at ¶ 61. These individuals, given the nature of the information provided, "would reasonably fear that disclosure of their identity would place them in danger." Id.

The FBI also properly withheld records consisting of information provided by individuals on the basis of an "express" assurance of confidentiality. Hardy explains that the FBI has asserted Exemption 7(D) to protect identifying data and information provided by two individuals: 1) one individual who assisted in an investigation conducted by the FBI and the Connecticut Violent Crimes Fugitive Task Force with an "express" assurance of confidentiality; and 2) another individual, whose name the FBI did not even record to protect against disclosure, who provided information regarding a narcotics distribution ring. Id. The Court agrees that, given the content of these investigations, even under an "implied" assurance of confidentiality the FBI would be permitted to withhold these records as both individuals "would reasonably fear that disclosure of their identity would place them in danger." Id. at ¶ 61. Consequently, the FBI properly withheld these records pursuant to Exemption 7(D).

### B. Moffat's Objections to the FBI's Exemption Claims

Moffat's challenge to the FBI's exemption claims turns on the significance of an FBI 302 report that Moffat alleges had been provided by the federal government to the Massachusetts Hampden County District Attorney's Office immediately prior to Moffat's murder trial in October 2001. The FBI also released a redacted version of this document in response to Moffat's instant FOIA request. Moffat asserts that, as a result of this document's previous unredacted disclosure, the FBI's exemption claims lack merit because the FBI "needed to show not that redaction protects some interest, but that redaction protects an additional interest given the previous release." D. 21 at ¶ 19. Moffat does not rely on any legal precedent to support this assertion. The Court finds the previous unredacted disclosure of this document irrelevant to the FBI's redaction determinations at issue here, as the standards for disclosure of information under FOIA are different from the standards for disclosure of information in a criminal trial. Compare 5 U.S.C. § 552(b)(7) (certain "records or information compiled for law enforcement purposes" exempt from disclosure under FOIA) with, e.g., United States v. Prochilo, 629 F.3d 264, 266 (1st Cir. 2011) ("under Brady, the government has a duty to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment").

In sum, Moffat has not shown bad faith on the part of the FBI when it decided what information to redact from the records it disclosed to Moffat. Nor has he otherwise shown that discovery is needed to resolve any genuine issues of material fact related to the redactions. See Asarco, 2009 WL 1138830, at *1-*3.

### VII. Fees

In his complaint, Moffat states that he sought costs and attorneys' fees under 5 U.S.C. §

552(a)(4)(E). D. 1 at 9 ¶ F. Moffat did not press this argument in any of his subsequent briefing to the Court.

Courts "may assess against the United States" reasonable attorneys' fees and litigation costs in any FOIA case "in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(I). Although the Court has now resolved the pending motions for summary judgment in favor of the defendant agencies, that resolution does not necessarily resolve the issue of fees and costs since a complainant has substantially prevailed if he obtains relief through "a voluntary or unilateral change in position by the agency" as a result of the complaint (as opposed to a prior administrative FOIA request) and "if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii)(II); Terri, Pravlik & Millian LLP v. Centers for Medicare & Medicaid, 2011 WL 2579739, *4 (D.D.C. June 29, 2011) (citing Judicial Watch, Inc. V. Bureau of Land Mgmt., 610 F.3d 747, 749 (D.C. Cir. 2010). When resolving a request for fees under FOIA, "a district court must conduct a two-step inquiry." Maynard, 986 F.2d at 568. "First, did plaintiff 'substantially prevail'? Second, if so, is plaintiff entitled to an award based on a balancing of equitable factors," id., including "(1) the benefit to the public, if any, derived from the case; (2) the commercial benefit to the complainant; (3) the nature of the complainant's interest in the records sought; and (4) whether the government's withholding of the records had a reasonable basis in law"? Aronson v. U.S. Dep't of Hous. and Urban Dev., 866 F.2d 1, 3 (1st Cir. 1989).

Here, the DEA and the ATF provided Moffat with no records as a result of his administrative FOIA request and with no records as a result of his complaint. Accordingly, he has not substantially prevailed against the DEA or the ATF.

As the Court has noted, the FBI is in a different posture. The FBI provided Moffat with no

records in response to his administrative FOIA request but *did* provide him with records after performing a more thorough search in response to his complaint. This unilateral change in the FBI's position may be sufficient to establish that Moffat has substantially prevailed at least with regard to the FBI. Since Moffat has not pressed his case for attorneys' fees and costs, he has not addressed whether 1) he has substantially prevailed against the FBI or 2) whether consideration of the four Aronson factors warrant the award of attorneys' fees and costs against the FBI. Accordingly, the Court will give Moffatt leave to file a memorandum, no more than ten (10) pages long, addressing these two, limited issues. Moffatt must file any such memorandum by August 19, 2011. If Moffat does so, the Court will give the FBI until September 2, 2011 to file a responsive filing that is no more than ten (10) pages.

**VIII.  Conclusion**

Based on the foregoing, the defendants' motions for summary judgment are GRANTED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge